STATE of Missouri ex rel. STATE HIGH-
WAY COMMISSION of Mis-
souri, Respondent,

v.

VORHOF–DUENKE COMPANY, a corpora-
tion, Milton Construction & Supply Compa-
ny, a corporation, A. Y. Building Company,
a corporation, and A. R. Building Compa-
ny, a corporation, et al., Appellants.

No. 48681.

Supreme Court of Missouri,

En Banc.

April 8, 1963.

Ziercher, Tzinberg, Human & Michenfelder, Albert A. Michenfelder, Jr., Clayton, for appellants.

Robert L. Hyder, Minor C. Livesay, Samuel C. Ebling, Jefferson City, for respondent.

STORCKMAN, Judge.

This is a suit for the condemnation of land adjacent to the existing U. S. High-

way 66 in northern St. Louis County for the construction of a limited-access highway, Interstate Route 270. The proposed new highway begins at the Missouri-Illinois state line and runs westwardly to its junction in St. Louis County with Interstate Route 70. The construction involves increasing the present right-of-way from 100 feet to 367 feet. Practically all of the new right-of-way will be taken from land on the south side of U. S. 66. The defendants own land on both sides of the existing right-of-way, most of which is zoned for commercial use; the rest is residential. The condemnation commissioners appointed by the court awarded the defendants damages in the total sum of $216,500. The plaintiff and the defendants both took exceptions to the commissioners' report. Four affiliated corporations, Vorhof-Duenke Company, Milton Construction & Supply Company, A. R. Building Company, and A. Y. Building Company, owned the land in question, but it was stipulated for the purposes of trial that the four companies could be treated as an entity and the damages could be awarded in one lump sum in the name of Vorhof-Duenke Company. The jury found for the defendants in the sum of $100,000 and they have appealed. The relator Highway Commission did not appeal.

U. S. Highway 66 runs generally east and west in northern St. Louis County. It is intersected by New Halls Ferry Road, which runs from the northwest to the southeast, and Old Halls Ferry Road, which runs practically north and south at the place in question. The two Halls Ferry Roads which are more than 1400 feet apart where they intersect U. S. 66 converge and unite a short distance south of U. S. 66, thereby forming a triangle consisting of approximately forty-four acres, all of which was owned by the defendants. Immediately north of the triangle and U. S. 66, the defendants owned sixty-five acres bounded on the east by Old Halls Ferry Road and on the west by New Halls Ferry Road. Both of these tracts north and south of U. S. 66 were zoned for commercial use. In the

southeast quadrant of the intersection of U. S. 66 and Old Halls Ferry Road, the defendants owned additional land abutting on both highways and having a frontage on U. S. 66 of 441 feet that was zoned commercial and 1690 feet zoned residential. The residential property had been platted as a subdivision known as Hathaway Manor. The defendants acquired and assembled practically all of this land in 1952. They planned to develop and to use the forty-four acres in the triangle south of U. S. 66 as the site of a regional shopping center because of its location and accessibility to the two Halls Ferry Roads and U. S. 66. The testimony and exhibits show that in recent years real estate improvement in northern St. Louis County has been very rapid and that a number of subdivisions and commercial enterprises have been developed in this area.

In this vicinity the project for the construction of Interstate Route 270 follows generally the established route of U. S. Highway 66. It will consist of two pavements, one eastbound and the other westbound, separated by a median strip. There will be a service road, or outer roadway, on the north and one on the south. Access to the Interstate Route will be limited and permitted only at designated intersections. For eastbound traffic, there will be an off ramp east of and leading into New Halls Ferry Road. An outer roadway will connect Old and New Halls Ferry Roads south of the pavements of the new highway. There will be an on ramp extending eastward from Old Halls Ferry Road permitting traffic to enter the eastbound traffic lane. There will be off ramps for westbound traffic both at Old Halls Ferry Road and New Halls Ferry Road. The Interstate Highway will pass under Old Halls Ferry Road and over New Halls Ferry Road. The present pavement of U. S. 66 will serve as the outer roadway on the north; there will be no extension to the north of the present right-of-way of U. S. 66. The only land taken from the sixty-five-acre tract on the north side is in area

of about a quarter of an acre consisting of two strips, each about thirty feet wide, one from the defendants' land on the east side of New Halls Ferry Road, and the other from land on the west side of Old Halls Ferry Road for widening the turnouts on those Roads.

The two pavements of Interstate 270 and the service road and ramps for the eastbound lane will all be south of U. S. 66 as it presently exists. The bulk of the land taken in this condemnation is a strip about 267 feet wide on the south side of the old right-of-way between the two Halls Ferry Roads and extending east of Old Halls Ferry Road into the Hathaway Manor subdivision. In addition to land previously mentioned, irregular pieces and strips were taken on the east side of New Halls Ferry Road and on both sides of Old Halls Ferry Road for the purpose of widening those highways and constructing turnouts. The parties stipulated that a total of 26.376 acres of the defendants' land was taken.

The condemnation action was filed on February 16, 1959. The date of taking was treated as June 26, 1959, and defendants' damages were to be assessed of that date. The trial began on September 26, 1960. The defendants having the burden of proof on the issue of damages presented their evidence first. Mr. Vorhof and Mr. Duenke each testified that the defendants' damages by reason of the taking were in excess of $800,000. The testimony of the former was $835,475 and the latter $866,886. They were experienced real estate men and had been associated for a number of years in the development of commercial and residential real estate. One other witness on behalf of the defendants testified that the damages were $522,660 and another $573,-500. All of these opinions as to damages were after allowance of special benefits resulting from the construction of the new highway, which, from the defendants' viewpoints, consisted solely of a drain to be constructed on the south side of the new right-of-way. The evidence showed that in October 1959 the defendants sold thir-teen acres from the triangle to Central Hardware Company at $20,000 per acre pursuant to a contract made prior to June 1959.

The principal questions presented on this appeal relate to the admission of evidence with respect to the value of special benefits to the remaining land and the manner in which these issues were submitted by the instructions to the jury. The plaintiff having the burden of proof on the amount of special benefits presented the testimony of three experienced real estate appraisers. All of these witnesses testified that the land remaining after the taking was worth more than it was before because of benefits resulting from the construction of the highway and that, therefore, the defendants had suffered no damage. One testified that the value of all of the defendants' land before the taking was $937,275 and the value of the remaining land after the taking was $1,003,000. Another testified that the value before the taking was $1,002,000 and afterwards it was $1,099,000. The other testified that the total value before the taking was $938,800 and that the value of the remaining land after the taking was $984,000. In general, the plaintiff's witnesses ascribed the increase in value to the construction of the service drives, or outer roadways, along the new highway and to a drainage ditch along the south side of the new right-of-way, and to the off and on ramps to be constructed at Old Halls Ferry Road and New Halls Ferry Road.

The first six points in appellants' brief involve the same basic principles of law. They relate to the admission of evidence as to special benefits and the instructions submitting to the jury the issues of special benefits. The instructions complained of are numbered 7, 8, and 9. They are as follows:

Instruction 7: "The court instructs you that the term 'special benefits', as used in these instructions, means any benefits causing an increase in the market value of a tract of land by reason of its position di-

rectly on an improved highway and which benefits are not enjoyed generally by other tracts of land in the neighborhood, no portion of which lands is taken by said highway; and such benefits are special and not general benefits, although conferred, if you so find, upon all the other tracts of land situated on the highway."

Instruction 8: "The court instructs the jury that if you find and believe from the evidence that the location and construction of the state highway immediately adjacent to the remainder of defendants' lands not taken by plaintiff, will increase the fair market value of such remaining lands, solely because of the immediate proximity and accessibility of such remaining lands to said highway, then such increase in value, if any, solely due to such proximity or immediate accessibility, is a special benefit and should be considered by you as such, even though you may further find that such special benefit, if any, is also enjoyed by other lands immediately adjacent to said highway, no portion of which is taken for state highway purposes, and that you should deduct such special benefits, if any, from the damages, if any, to which the defendants may be entitled for the taking by plaintiff of a portion of their land and the damages, if any, to the remainder of defendants' land."

Instruction 9: "You are instructed that if you find and believe from the evidence in this case that, as a result of the improvement of the highway, the market value of the defendants' property, described in evidence, which is not taken (considering any uses for which it is reasonably adapted) is increased by reason of its position directly upon the improved highway to such an extent that the market value of the defendants' tract, without that part which has been taken, is more than, or as much as, was the market value of the whole tract (for any use to which it was reasonable adapted) immediately before the improvement of the highway, then your verdict must be for the plaintiff."

The principal reasons the instructions are alleged to be prejudicially erroneous are that instructions 7 and 9 assume and inform the jury that defendants' remaining land will be "directly upon the improved highway" contrary to the evidence that access to and exit from the new highway would be limited and obtainable only by the indirect means of service roads and off and on ramps; that the evidence did not justify the submission of special benefits as defined in instruction 7; that instruction 8 incorrectly defined special benefits and permitted the jury to assess general benefits against the defendants; that instruction 8 informed the jury that defendants' remaining land was immediately proximate and accessible to the new highway contrary to the evidence; that instruction 9 (a verdict-directing instruction) constituted a general charge and roving commission to the jury; that all three of the instructions improperly commented on and emphasized special benefits and were conflicting, contradictory and misleading.

The plaintiff asserts the statements that the defendants' remaining land was directly upon and immediately proximate and accessible to the new and improved highway are justified by the fact that the evidence showed that the defendants' property abutted on outer roadways and ramps, which in turn were connected with and a part of the high-speed divided lanes of Interstate 270. Directly means in a direct manner and without anything intervening. The very term limited-access highway conveys the idea that ingress and egress to the main traveled portion of the highway has been circumscribed and restricted. Even if an outer roadway and ramp are close at hand, their course and place of entrance may be roundabout and difficult for an uninitiated traveler to traverse. Mr. Wilkie Cunnyngham, an assistant attorney of the Missouri State Highway Department, in his article, "The Limited-Access Highway From a Lawyer's Viewpoint", published in 13 Mo. Law Review 19, in explaining a limited-access highway stated, among other

things, loc. cit. 22: "No direct access to the thruway except at certain well spaced entrances and exits connecting outer-roadways and intersecting highways. The thruway lanes are often elevated, depressed, or fenced from the rest of the highway and abutting property. The usual direct access is allowed between outer-roadways and abutting property." Furthermore, in paragraph 5 of plaintiff's petition and on the face of the plans which are in evidence, it is stated that "No abutting owner shall have the right of direct access to said highway or its right of way".

In the sense of moving a greater volume of through traffic at high speed, the new highway is an improvement; but it appears inadvisable in a case of this nature to instruct the jury that Interstate 270 is "an improved highway" when the principal issue is whether this new and different type of highway has benefited or damaged the property which previously had direct and unlimited access. The term "improved highway" might be misleading on the issues involved in this case; it is certainly unnecessary to a proper submission. What we have said with respect to the remaining land being directly on an improved highway applies to the other statements that the remaining land was immediately proximate and accessible to the new highway though perhaps with less force and in a less degree. These instructions appear to be the kind given in the condemnation of a right-of-way for a conventional land-use highway, but the language used is unsuited to this type of case. They assume and direct the jury as a matter of law upon subjects that should be submitted to the jury as fact issues.

The previously existing U. S. 66 was what is sometimes referred to as a "land-service road" which is a term used to describe the ordinary road or highway which is intended primarily to enable abutting landowners to have access to the outside world as distinguished from the limited-access road which is a "traffic-service road"

designed primarily to move through traffic. 43 A.L.R.2d 1074. The land-service type of road is the one most familiar to the average person. The Highway Commission is authorized, however, to limit access to, from, and across state highways where the public interest and safety may require. Art. IV, § 29, Constitution of Missouri 1945, V.A.M.S. It is also authorized to cooperate with the United States and to comply with any federal law or requirement which is a condition to receive federal funds. Art. IV, § 30, subd. 2(3) (d), Constitution of Missouri 1945. The construction of roads in the Interstate System calls upon both of these powers.

The basic purpose of the limited-access highways constructed under the Interstate System has been described in Winn v. United States, 9 Cir., 272 F.2d 282, 288, as follows: "The Federal-Aid Highway Act of 1956 clearly contemplates the 'free flow of traffic on the Interstate System.' 70 Stat. 374, § 112, 383–384. If every abutting landowner were given access to the Interstate, the free flow of traffic would be impeded and the object of the Interstate System frustrated. The purpose of the Interstate is to facilitate the movement of traffic, not to serve abutting landowners." The Interstate System means the National System of Interstate and Defense Highways, Title 23 U.S.C.A. § 101, and the same Title, § 111, provides: "All agreements between the Secretary and the State highway department for the construction of projects on the Interstate System shall contain a clause providing that the State will not add any points of access to, or exit from, the project in addition to those approved by the Secretary in the plans for such project, without the prior approval of the Secretary. Such agreements shall also contain a clause providing that the State will not permit automotive service stations or other commercial establishments for serving motor vehicle users to be constructed or located on the rights-of-way of the Interstate System."

Limiting access to public highways is of comparatively recent origin. The power to do so first appeared in our 1945 Constitution. "Abutting owner's right to damages or other relief for loss of access because of limited-access highway or street" is the subject of an annotation in 43 A.L.R.2d 1072, and this statement supported by the great weight of authority appears at page 1074, § 3: "Where an established 'land-service road,' in which the normal right of access had already come into being, is converted into a limited-access way in such a manner that the existing rights of access are destroyed, the owners of such rights are entitled to compensation, exactly as they would be if such rights were destroyed by any other type of construction." For later cases on the subject of this annotation, see A.L.R.2d Supplement Service, 1960 Issue, p. 2954, supplementing the annotations in A.L.R.2d Volumes 20–68; and A.L.R.2d Supplement Service 1962 Issue, p. 952, covering A.L.R.2d Volumes 1–80. In accord is the Missouri case of State ex rel. State Highway Commission v. James, 356 Mo. 1161, 205 S.W.2d 534, 537 [7, 8]. In addition to Mr. Wilkie Cunnyngham's dissertation, supra, there are articles in 27 Washington Law Review, p. 111, and 3 Stanford Law Review, p. 298, on the subject of limiting access to and egress from public highways.

■ Where, as here, the condemnation of existing rights of access are involved, the ascertainment of special benefits to the landowners' damages becomes even more complicated. The generally accepted definitions and distinctions between general and specific benefits are set out in State ex rel. State Highway Commission v. Jones, 321 Mo. 1154, 15 S.W.2d 338, 340, cited by both parties, as follows:

" 'General benefits,' those accruing to the owners of property in a neighborhood or vicinity generally, are not deductible from the damages; to make such a deduction would be to require the landowner, whose property is taken in part to liquidate his damages by contributing his share of the benefits which inure to the public as a whole. 'Special benefits' stand on a different footing; they are such as accrue directly and proximately to the particular land remaining by reason of the construction of the public work on the part taken. Such benefits must, of course, be reflected in an increase in the market value of the land.

"While there is often a contrariety of opinion as to whether the benefits in specific instances are general or special, the general distinction is well understood. 'A general benefit is an advantage not peculiar to the remainder of a tract part of which is taken, but conferred by the public work upon all property within range of its utility.' Randolph, Em.Dom. § 269, p. 250. It is also well settled that a benefit, though conferred upon several tracts of land similarly situated, may nevertheless be a special and not a general benefit.

" 'A special benefit is an advantage conferred upon a tract by reason of the maintenance of public work on it,—an advantage differing in kind, or at least in great degree from a general benefit. But it is to be noted, that an advantage is none the less a special benefit because it is conferred upon all the tracts of land upon which the public work is constructed. Indeed, a benefit may be special, although it is conferred also upon land not taken. Thus, where a street is widened by the condemnation of a strip of land along one side, the owner cannot complain because his remaining land is charged with a benefit which the widening necessarily confers upon lots on the opposite side.' Randolph, Em.Dom. § 270, p. 251."

The Jones case involved the condemnation of a right-of-way where no highway had previously existed, and the ascertainment of benefits due to the new road was perhaps less complicated than here; at least a greater store of practical experience with assessing damages and benefits resulting from the construction of land-service

roads had been accumulated than we have had with the impact of limited-access highways upon land in its vicinity.

The importance of the rules concerning the deduction of benefits from the landowner's aggregate damages in eminent domain cases and the difficulty of applying them is indicated by a 292-page annotation in 145 A.L.R. beginning on page 7. The then existing Missouri decisions are discussed beginning on page 222. The annotation undertakes to distinguish between special benefits which can be deducted from the landowner's damages and general benefits which cannot. The annotation states that "the distinction between special and general benefits is difficult and confusing in its application, because the line of demarcation between the two kinds of benefits is shadowy, and they so shade into each other that in practice it is often impossible to distinguish between them." 145 A.L.R. 48–49. The purpose of the foregoing discussion is to demonstrate the difficulty which trained legal minds have in distinguishing between general and special benefits and the consequent need for submitting the issue of special benefits with all possible clarity.

Instruction 3 advises the jury that in estimating the defendants' damages it should take into consideration the fair market value of the 26.376 acres of land taken, the damages, if any, to the remainder of defendants' land known as Lots 1 and 2 of Hathaway Manor, and the special and peculiar benefits "which may accrue to the remainder of defendant's land by virtue of the location and construction of Interstate Highway #270." The instruction then concluded: "By special and peculiar benefits is not meant the benefits which the defendant derives in common with the other landowners generally in the vicinity upon the location and construction of said highway, but such benefits as will be enjoyed by the defendant which are not also enjoyed by other lands generally in the neighborhood." Instructions 7, 8, and 9, heretofore set out,

also deal with benefits. Instruction 7 defines special benefits in somewhat different language than instruction 3. An instruction identical with instruction 7 was given in State ex rel. State Highway Commission v. McCann, Mo.App., 248 S.W.2d 17, 24, as instruction 4, but its correctness was not an issue in that case. Instruction 8 also discusses in general terms special benefits and directs the jury to deduct special benefits from the defendants' damages. Instruction 9 does not mention benefits, either general or special by name, but in general terms directs the jury to return a verdict for the plaintiff if the remaining land, "by reason of its position directly on the improved highway", is worth more after the taking than the entire tract was worth before. The plaintiff contends that special-benefit instructions are in effect converse-damage instructions and that it is not necessary to hypothesize facts, but the law seems to direct otherwise.

■ Exceptions to the award of the commissioners in a condemnation case are triable de novo to a jury in accordance with the procedure applicable to ordinary civil actions. State ex rel. State Highway Commission v. Green, Mo., 305 S.W.2d 688, 694[6]. Section 226.270 RSMo 1959, V.A.M.S., provides that the State Highway Commission in the condemnation of land and other properties shall proceed in accordance with the provisions of Chapter 523 of the Missouri statutes insofar as applicable. Section 523.050(2) provides that where exceptions to the report of the commissioners are filed the new appraisement shall, at the request of either party, be made by a jury under the supervision of the court "as in ordinary cases of inquiry of damages". See also § 510.270. No authority has been cited and we have found none exempting condemnation cases from the instruction practice applicable to similar issues in other civil actions.

In support of its assertion that the hypothesizing of facts in damage instructions is not required and is regarded as a bad

practice in condemnation cases, the plaintiff cites State ex rel. State Highway Commission v. Day, 226 Mo.App. 884, 47 S.W.2d 147, and State ex rel. State Highway Commission v. Volz Concrete Materials Co., Mo., 330 S.W.2d 870. An examination of these two condemnation cases, however, reveals a consistency with the instruction practice in ordinary civil actions. The Day case, 47 S.W.2d 149–150, states: "Properly advising the jury as to the elements which they may consider in estimating damages is not a comment on the evidence or giving any feature or element thereof undue prominence." The Volz case approved the condemnee's instruction which listed items of damages which the jury could consider, although the instruction went into "more evidentiary detail than would have been necessary or desirable". The opinion stated, 330 S.W.2d loc. cit. 873–874, that "it is proper to advise a jury what elements it may consider in estimating the amount of damages," and "we have approved instructions in condemnation cases which go into considerable detail in describing specific matters which may be considered." In a recent contract case, Red-E-Gas Company v. Meadows, Mo.App., 360 S.W.2d 236, 241[7], the court stated: "The measure of damages in an action for breach of contract is a matter of law for the court to declare in its instructions and not a subject to be left to rank conjecture and unbridled speculation by the jury." In addition to the cases cited in Meadows, see generally Mo.Dig., Damages, ☞210(1) and 217, and more particularly Mo.Dig., Eminent Domain, ☞222(1, 5, 6).

By instruction 3, the defendants limited their submission of residual damages "to the remainder of defendant's land known as Lots 1 and 2 of Hathaway Manor". These residential lots, one of which had a house on it and the other was unimproved, were not designed to be used as a part of the whole tract. The defendants did not undertake to prove or submit residual damages by reason of limitations put on their access to the highway, so there is no such issue in this case. Thus, there are three major propositions involved: (1) the fair market value of the land actually taken, (2) the residual damages, if any, to Lots 1 and 2, and (3) the special and peculiar benefits, if any, to the remaining land. As to the first item, all that remained to be done was the ascertainment of the fair market value of the 26.376 acres of land appropriated by the plaintiff. But with regard to the other propositions involved *the existence* of residual damages and special benefits must be proved, submitted, and found by the jury. This in essence involves a question of "liability" or establishing the existence of rights to residual damages and to special benefits before the amount thereof can be assessed.

Special benefits can be established and utilized only as a setoff to condemnee's damages which as used here includes compensation for the land actually taken as well as damages to the remainder. Such a setoff is similar in nature to recoupment or a counterclaim. See State v. Weatherby, 344 Mo. 848, 129 S.W.2d 887, 893[11]. Special benefits must be established in much the same manner that a setoff is ascertained and recovered in any other civil action. This is by no means a novel proposition. See Bruecker v. City of St. Louis, Mo., 246 S.W. 889, 892[7, 8]; Haysler v. Owen, 61 Mo. 270, 273.

"Generally, the burden of proving *the existence* and *amount* of special and peculiar benefits is on the party seeking to condemn the land, although there is authority holding that certain improvements give rise to a presumption of benefit. The general rules of evidence in civil cases and proceedings govern and control the admissibility and the weight and sufficiency of evidence on the question of benefits." Emphasis added. 29 C.J.S. Eminent Domain § 184, pp. 1067–1068. Numerous Missouri cases are cited in support of these statements of law. In State ex rel. State Highway Commission v. Jones, 321 Mo. 1154, 15 S.W.2d 338, 341, the court held that a high-

way constructed where none had been before presumptively conferred a special benefit on the adjoining land, but whether it actually did was a question for the jury to determine. See also City of St. Louis v. Hamley Realty Co., 329 Mo. 1172, 48 S.W. 2d 938, 940 [6–8].

In its supplemental brief the plaintiff cites us to general definitions of the term "special benefits" and suggests that the application of the term "is difficult to understand not primarily because of the difficulty in application of the doctrine but rather because of the problem of semantics presented." It refers to definitions of special benefits and general benefits taken from 18 Am.Jur., Eminent Domain, § 298; Lewis, Eminent Domain, 3d Ed., §§ 702, 705; and other texts and decisions. The plaintiff suggests that the difficulty might be avoided by considering the "end product" which is the enhancement of the land value. The definitions in general are not in dispute; moreover, plaintiff's argument overlooks the effect of general benefits on the land value and again avoids consideration of the causative factors which produce the special and peculiar benefits and which in turn enhance the value of the remaining land. These general statements need to be broken down in their application to a particular situation as was done in the case of State ex rel. State Highway Commission v. Young, 324 Mo. 277, 23 S.W.2d 130, 135, wherein the court stated: "While the distinction is sometimes hard to draw, the rule in this state in the ordinary case is that special benefits are to be differentiated from general benefits by their nature or kind rather than by the amount or degree." And, in further distinguishing between general and special benefits and in specifying the basis of the latter, the opinion states: "All the land in the community may not—almost certainly will not—receive the same general benefits in a monetary sense; and the general benefits derived by the particular tract in litigation might be greater than those enjoyed by any other land, and would be reflected in its increased value. But only that part of the increase

resulting from special benefits—those, if any, arising from the land's position directly on the highway improvement, *such as availability for new or better uses, facilities for ingress and egress, improved drainage, sanitation, flood protection, and the like*—would be chargeable." Italics supplied. In discussing items of damages and of special benefits, State ex rel. State Highway Commission v. Clevenger, 365 Mo. 970, 291 S.W.2d 57, 62[2], states that "the modes of access provided * * * and the reasonably probable uses of the remaining property, may and should be considered in determining the question of special benefits, if any, to defendants." See also Mississippi County v. Byrd, 319 Mo. 697, 4 S.W.2d 810, 812–813, and the Jones case, 321 Mo. 1154, 15 S.W.2d 338, 341.

Apparently, the only items of special benefits mentioned in Young and the other cases that could be involved in the present case are new or better uses, facilities for ingress and egress, and improved drainage. It is conceded that the drainage would be improved; the defendants had contemplated doing this at their own cost until the plaintiff provided for it in the plans for the construction of the highway. But it is not clear from the present record that the remaining land would be adapted to new or better uses. The highest and best use of the land between the Halls Ferry Roads both before and after was for a regional shopping center; the other land was and remains residential.

In its supplemental brief the plaintiff contends that the remaining land was specially benefited because of the "rarity" of the right of access to the new highway, citing State of Oregon by and through State Highway Commission v. Bailey, 212 Or. 261, 319 P.2d 906, 929. The Bailey case is similar to our Clevenger case in that the limited-access highway was an entirely new construction and did not replace in any considerable degree a land-use highway. The importance of the Bailey case as regards our present inquiry is its analysis of special

benefits and its recognition that there are "*elements* going to make up special benefits." Italics added. 319 P.2d 918. In the Bailey case the elements of special benefits such as making farm land available for commercial and residential purposes were set out quite specifically in the pleadings. Although Missouri does not seem to require a particularized pleading in this respect, the existence of the essential elements of special benefits must be proved and submitted as similar issues are in other civil actions. Where a limited-access highway is substituted for a land-use highway, there does not appear to be any basis for a presumption of special benefit to the adjoining land; but the condemnor is entitled to prove, if it can, that the limitations imposed on the adjoining landowner's right of access are in fact a special benefit.

■ Plaintiff's instruction 8 directed the jury to deduct, or set off, special benefits, if any, from defendants' compensation for the land taken and the damages, if any, to the remaining land. Instruction 9 directed a verdict for the plaintiff if the market value of the land remaining exceeded the market value of the whole tract before the taking. In condemnation cases, as in other civil actions, the giving of an instruction which directs a recovery and which consists of a statement of abstract principles of law not related to the fact issues is usually condemned and will constitute reversible error when the jury has been misled or the complaining party prejudiced. Chicago R. I. & P. R. Co. v. Hosman, 227 Mo.App. 659, 57 S.W.2d 434, 436[3]; State ex rel. State Highway Commission v. Haid, 332 Mo. 606, 59 S.W.2d 1057[1, 12, 13, & 14]; State ex rel. State Highway Commission v. Williams, 227 Mo.App. 196, 51 S.W.2d 538[7, 10]; Hook v. Chicago & Alton R. Co., 133 Mo. 313, 34 S.W. 549, 551[2]. Also see generally Mo.Dig., Eminent Domain, ⊜222(1, 2, 4, 5, & 6), relating to instructions in eminent domain cases.

■ Instructions 7, 8, and 9 are vulnerable to the attack that they constitute general charges and are a roving commission; in conjunction, they are repetitious, confusing, and misleading. Instruction 9 is further erroneous in that it permits the jury to assess general benefits against the defendants. State ex rel. State Highway Commission v. Manzer, 229 Mo.App. 287, 77 S.W.2d 123[1]; State ex rel. State Highway Commission v. McCann, Mo.App., 248 S.W.2d 17, 24[10–12]. We hold the giving of these instructions to be prejudicial and to constitute reversible error.

The prejudicial effect of these abstract instructions is particularly aggravated in view of the state of the evidence as to special benefits. The defendants conceded that the improved drain along the south side of the new right-of-way for storm and surface water was a special benefit and fixed the cost of its construction at $14,090; the plaintiff's evidence of cost was somewhat higher. It would seem that the instructions should give the jury some guide for determining the value added to the remaining land by reason of the improved drainage. Two other objects referred to as special benefits were the ramps and outer roadways. The evidence would be more helpful if it demonstrated in what manner these facilities would enhance the value of the adjacent land, such as making it available for new or better uses or improving its access. These are two of the several elements of special benefits mentioned in the Young case, supra, 324 Mo. 277, 23 S.W.2d 130, 135. In Kansas City Suburban Belt Ry. Co. v. McElroy, 161 Mo. 584, 61 S.W. 871, the availability of abutting land for switch tracks was the subject of testimony and was specifically submitted as an issue for the jury in a railroad condemnation case. As to the specific nature of special-benefit testimony, see Cape Girardeau & C. R. Co. v. Bleechle, 234 Mo. 471, 137 S.W. 974, 976[2]. This court has held that increased facilities for the travel and transportation of the general public are not such benefits as may be deducted from the compensation and damages. Mississippi

County v. Byrd, 319 Mo. 697, 4 S.W.2d 810, 813[8].

One of plaintiff's expert witnesses admitted that his testimony as to the increase in value was based both on general and special benefits. In giving an opinion as to the value of property taken, an expert witness is required to base his opinion upon elements that can properly be considered. Mayor, etc., of City of Liberty v. Boggess, Mo., 321 S.W.2d 677, 681–682[4]. In Hook v. Chicago & Alton R. Co., 133 Mo. 313, 34 S.W. 549, 551[2], this court stated: "The opinions of the witnesses that defendant was benefited did not, standing alone, amount to proof of benefit. Such opinions may sometimes be tolerated in this sort of proceeding, if accompanied by some facts that tend to give a foundation to the opinions." See also Mississippi River Fuel Corp. v. Whitener, Mo.App., 237 S.W.2d 239, 243 [4], and Missouri Power & Light Co. v. Creed, Mo.App., 32 S.W.2d 783, 787[6, 7]. While it is generally said that the excess of damages or benefits is determined by a comparison of the value of the entire tract before the taking and the value of the land remaining after the taking, it does seem that an expert witness should have some opinion with respect to the market value of the land actually taken, the value of the remaining tract as it existed before and after the appropriation of the part taken, and other matters necessary to give his opinion a foundation.

The mere fact that the value of the remaining property was greater after the taking does not warrant the deduction of such enhancement from the damages since there may be other factors tending to increase the value aside from the reconstruction of the highway. North Nishnabotna Drainage Dist. v. Morgan, 323 Mo. 1, 18 S.W.2d 438, 440[4]. The Morgan case held a measure of damages instruction erroneous which directed the jury that no damages should be allowed if the remaining land was as valuable after the taking as it was before.

One of plaintiff's witnesses testified that in the development of the Northland Shopping Center in St. Louis County the landowners were required to spend the sum of $250,000 to install roads, ramps, and lanes similar to those in the vicinity of defendants' remaining property. It may be that defendants' objection was not timely, but such evidence should not be admitted over proper objection. Such a comparison is not a proper standard for assessing special benefits. Furthermore, the ramps and roadways in question were not and could not be constructed for the exclusive benefit of the defendants; they were for the use of the general public including the users of the Halls Ferry Roads, whether nearby or remote from the interchange. State ex rel. State Highway Commission v. James, 356 Mo. 1161, 205 S.W.2d 534, 538[9].

It is for the trial court in the first instance to say whether particular testimony tends to prove the existence of a special benefit. It is for the jury to say under all of the relevant testimony whether the abutting land was in fact specially benefited in the respect contended and, if so, to determine the amount thereof. The courts and counsel have the responsibility of furnishing the jury effective guidance on the law of the case.

There is no merit to the defendants' contention that the court erred in refusing to allow their witnesses to testify as to the market value of comparable real property computed from the witnesses' knowledge of the lease on the property and its terms. The capitalization of rentals may tend to show the value of the particular property under lease, but an expert witness cannot give an opinion of the value of similar land in support of his opinion of the value of the land in question. 5 Nichols on Eminent Domain, 3d Ed., § 18.45[1], p. 182. Such testimony does not have the independent evidentiary value of an arms-length sale of comparable property in the vicinity. City of St. Louis v. Sheahan, 327 Mo. 305, 36 S.W.2d 951, 954[8].

Since the case must be retried, it is not necessary to discuss other matters which are not likely to recur at another trial.

The judgment is reversed and the cause remanded.

All concur.