**CITY OF MARYLAND HEIGHTS, Missouri, Appellant,**

v.

**Robert J. HEITZ and Loretta Tucker, Respondents.**

No. ED 95756.

Missouri Court of Appeals, Eastern District, Division One.

Nov. 1, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 12, 2011.

Application for Transfer Denied March 6, 2012.

Paul Martin, Katherine Moore, St. Louis, MO, for appellant.

Gerard T. Carmondy, Kelley F. Farrell, Andrew D. Lamb, St. Louis, MO, for respondents.

GARY M. GAERTNER, JR., Judge.

*Introduction*

Appellant, the City of Maryland Heights, Missouri (the City), appeals the judgment of the Circuit Court of St. Louis County, after a jury awarded damages to Respondents Robert Heitz and Loretta Tucker (Owners) in the amount of $1,809,000 as just compensation for the City's partial taking of Owners' property. We affirm.

*Background*

In 1961, Owners purchased a 12–acre tract of land (the Heitz Property), located on the south side of Dorsett Road, just east of what is now Interstate 270 in Maryland Heights, Missouri. At the time Owners acquired the Heitz Property, it was surrounded by vacant land and was not near a highway. On the rear portion of the Heitz Property, away from Dorsett Road, Owners built Heitz Machine and Manufacturing Company (Heitz Machine). Owners also constructed a private drive down the center of the Heitz Property, leading from Dorsett Road to Heitz Machine.

Once Interstate 270 was built just west of the Heitz Property, Owners received numerous inquiries from developers interested in purchasing their vacant portion of land along Dorsett Road for commercial or retail use. Owners refused these offers because they were not interested in selling the land outright. In the early 1980's, Charles Drury, Sr., expressed an interest in purchasing a portion of the Heitz Property along Dorsett Road in order to build a Drury Hotel. Owners still did not desire to sell, but they made an arrangement in which Owners invested two and a half acres of their land (the hotel property) in the venture, and Owners became limited partners in the Drury Hotel subsequently built on the property. This left a remaining vacant portion of the Heitz Property along Dorsett Road, east of the hotel property about equal in width to the hotel property.

Over the next several years, Owners received additional offers to purchase their remaining vacant portion of land along Dorsett Road. Mr. Drury, Sr., had also shown interest in that portion of the Heitz Property as well for a new hotel, as it was his custom to convert older Drury Hotels into Pear Tree Inns and to build new Drury Hotels on adjacent property. Mr. Heitz agreed to hold the property for another Drury Hotel rather than to sell.

Also during the 1980's, the Edward D. Jones Company (Jones), developed a North Campus in Maryland Heights, covering approximately 50 acres of land just southeast of the intersection of Dorsett Road and Interstate 270. Jones wanted to expand its campus shortly thereafter, but was unable to because of the current makeup of the Dorsett–270 intersection. The intersection nearest the entrance to the Jones campus, at Dorsett Road and Progress Parkway, just east of Interstate 270, was very close to the highway, causing frequent traffic congestion and back-ups. In the late 1990's, Jones again desired to expand its North Campus, but was still unable to do so because of the intersection, thus Jones expanded in other areas of St. Louis outside Maryland Heights. Jones began requesting that the City, along with state and federal agencies, explore ways of changing the intersection, including the relocation of Progress Parkway.

Also during the 1990's, Jerry Gidlow, a real estate representative, approached Mr. Heitz and stated that an unnamed party was interested in purchasing the Heitz

Property. Mr. Gidlow came to him several times over the next six or eight years, and each time Mr. Heitz told him he was not interested in selling his property because he was holding it for someone else. The last time they met, Mr. Heitz learned that Mr. Gidlow represented Jones. Mr. Gidlow told Mr. Heitz that Jones was interested in the property because the City was likely to relocate Progress Parkway, and Jones would need an entrance to its campus from Dorsett Road. Mr. Heitz was not aware the City had any redevelopment plans at that time.

In 2002, the City created a redevelopment plan for the intersection of Interstate 270 and Dorsett Road, called the "Heitz Redevelopment Plan," which included the construction of a public road through the east end of the Heitz Property. Mr. Heitz was not aware of this particular plan until just before the trial in this matter in 2010. In 2003 and 2004, Mr. Heitz had attended public meetings regarding proposed redevelopment of the area. The City presented four possible alternatives for redevelopment, each of which contained construction of a public road going through the Heitz Property. In November of each year from 2006 through 2008, the City had also posted on its website maps showing development opportunities. Part of the Heitz Property was included as a development opportunity each year, yet Mr. Heitz was not aware that his property was being advertised in this way by the City.

In 2006 or 2007, a representative of the City, Dan Devereux, came to Mr. Heitz in an attempt to facilitate the sale of his property to Jones. Mr. Devereux showed Mr. Heitz plans from 2004, which had been prepared for Jones, depicting a road going through the Heitz Property and requiring the teardown of Heitz Machine.

In response, Mr. Heitz went to the Maryland Heights City Hall and spoke to Wayne Oldroyd. Mr. Oldroyd gave Mr. Heitz a copy of some plans the City had for his property, which were identical to the 2002 Heitz Redevelopment Plan that Mr. Heitz learned of just before the trial in 2010. Mr. Heitz later spoke with another representative of the City who encouraged him to donate his property to the City. Mr. Heitz responded he was unable to donate his land.

The City subsequently filed this condemnation action and took title to a portion of the Heitz Property near the end of 2008. The City's development plans included relocating the Progress Parkway–Dorsett intersection further east. This would be accomplished by widening the private drive that Owners had built, which ran north-south down the middle of the Heitz Property from Dorsett to Heitz Machine. The private drive would become the new Progress Parkway, a four-lane public road. Two traffic signals would be constructed: one at the intersection of Dorsett Road and the new Progress Parkway, and one further south on Progress Parkway just north of Heitz Machine. At the southern stoplight, Progress Parkway would curve west, running in between the south side of the Drury Hotel and the north side of Heitz Machine, and becoming the new entrance to the Jones campus.[1] In this condemnation, the City acquired approximately 1.49 acres of land along with permanent and temporary easements.

The Commissioners appointed by the Circuit Court to assess the damages to Owners concluded that the City owed $1,218,500 as just compensation for the

1. The CFO of Jones, Mr. Steve Novik, testified that Jones would not have expanded its Maryland Heights campus without this project.

partial taking. Both parties filed exceptions to this award, and the Circuit Court of St. Louis County held a jury trial to determine damages.

At trial in 2010, each party introduced experts who testified to the market value of the land before and after the taking. Mr. Heitz's opinion as to the amount of his damages was $2.5 million. Other experts offered by Owners had opinions that the damages ranged from approximately $2.17 million to $2.23 million. Charles Drury, Jr., testified that because of the reduced size of the land remaining along Dorsett Road after the taking, he was no longer interested in building a hotel on the Heitz Property. Another expert for Owners, Rich Obertino, testified that in his experience as a developer, the remaining land along Dorsett Road would no longer be viable for mixed-use development options such as hotels and restaurant-type combinations.

The City's experts testified that the Heitz property benefited so greatly from the development projects that the remainder of Owners' land was worth the same or more after the taking than the entire tract was before. These experts compared the effect of the taking to winning the lottery, receiving a gift from Santa Claus, or having their own personal stimulus package. While two of the City's three experts testified that the increase in value of the remainder property meant the City did not owe any damages to Owners, the City's third expert did assess a damage amount of $33,979.

The jury awarded Owners damages in the amount of $1,809,000. This appeal followed.

## Discussion

The City raises seven points on appeal. In Point I, the City argues that the trial court improperly determined that the new traffic signal at Dorsett Road was a general benefit and therefore improperly excluded evidence that the signal specially benefited the property. Point II argues that the trial court erred in allowing the testimony of Charles Drury, Jr., concerning the developability of the property as a hotel because Owners did not disclose Mr. Drury, Jr., as an expert witness. Points III, IV, and V ascribe error due to lack of foundation in the trial court's admission of certain expert testimony. The City argues in Point VI that the trial court erred in denying the City's motion for new trial because of the foregoing allegations of error, and claims additional errors in Owners' cross-examination which the trial court allowed. Finally, Point VII requests plain error review of statements in Owners' closing argument concerning the effect of the taking on Owners' intent to develop the property with Drury Hotels.

## Standard of Review

Regarding Points I through VI, the admission or exclusion of evidence is a matter of the trial court's discretion. *State ex rel. Mo. Highway Transp. Comm'n v. Kuhlmann*, 830 S.W.2d 569, 571 (Mo.App. E.D.1992). We will not reverse the trial court's decisions in this regard absent substantial or glaring injustice. *State ex rel. State Highway Comm'n v. Texaco, Inc.*, 502 S.W.2d 284, 289 (Mo. 1973). "An appellate court will not ordinarily disturb a judgment for damages based on conflicting evidence in a condemnation proceeding where the amount awarded is the subject of conflicting evidence and is within the limits of the proof." *State ex rel. State Highway Comm'n v. Ellis*, 382 S.W.2d 225, 236–37 (Mo.App. 1964).

However, any legal conclusions made by the trial court, we review de novo. *St. Louis County v. Meyer Prop., LLC,*

250 S.W.3d 833, 835 (Mo.App. E.D.2008). We review de novo the trial court's determination that the stoplight at Dorsett Road was a general benefit.

■ Regarding Point VII, Rule 84.13(c)[2] allows for consideration of unpreserved claims of error on appeal. This type of review is rare and is limited to those instances in which the admission of evidence engenders hatred, passion, or prejudice resulting in manifest injustice or miscarriage of justice. *Buatte v. Schnuck Markets, Inc.*, 98 S.W.3d 569, 573 (Mo. App. E.D.2002) (en banc).

### Point I

■ The City argues that the trial court erred in ruling that the traffic signal on Dorsett Road was a general benefit. The City argues the traffic signal was in fact a special benefit that the City should have been able to present to the jury to offset damages. We disagree.

■ A land owner whose property has been partially taken is entitled to just compensation for the land taken and also for any proximate damage to the remainder of his land. *State ex rel. State Highway Comm'n v. Gatson*, 617 S.W.2d 80, 82 (Mo.App. E.D.1981). The damages awarded should equal the difference between the fair market value of the subject property before and after the taking. *Glaize Creek Sewer Dist. of Jefferson County v. Gorham*, 335 S.W.3d 590, 594 (Mo.App. E.D. 2011) (quoting *Mo. Highway & Transp. Comm'n v. Horine*, 776 S.W.2d 6, 12 (Mo. banc 1989)). However, because takings for development projects also involve benefits to the land that affect fair market value, special benefits to the remaining land may be used to offset damages, whereas general benefits may not be used to offset damages. *State ex rel State*

*Highway Comm'n of Mo. v. Koziatek*, 639 S.W.2d 86, 88 (Mo.App. E.D.1982).

■ Regarding the admission of benefits evidence in a condemnation proceeding, "[i]t is for the trial court in the first instance to say whether particular testimony tends to prove the existence of a special benefit." *Vorhof-Duenke*, 366 S.W.2d at 340. Then, it is for the jury to determine whether the development project actually conferred a special benefit upon the land, and if so, to determine the benefit's value. *Id.*

Here, the City argues that the new traffic light at Dorsett Road specially benefited the remainder of the Heitz Property by increasing the property's accessibility, visibility, frontage, and connectivity, and by lessening the cost of any subsequent commercial development. Owners countered with evidence that the project actually decreased accessibility, connectivity, and frontage because it removed direct frontage access to Dorsett Road. Thus, before submitting the issue to the jury, the trial court first had to determine whether the evidence of this particular stoplight on Dorsett Road, independent of the newly-constructed road, tended to prove a special benefit.

We have not found a case and the parties have not provided a case that determines whether a particular traffic signal is a general or special benefit to the landowner whose nearby land was partially taken. *Cf. Ellis*, 382 S.W.2d at 236 (Mo.App.1964) (declining to decide issue because jury could have found stoplight existed prior to taking). While the installation of the traffic signal at issue was part of the redevelopment project for a portion of the Heitz Property that was condemned, the signal itself was moved from one location on a

---

**2.** All rule references are to Mo. R. Civ. P.2011, unless otherwise indicated.

public road to another location. Therefore, we must examine the difference between these two types of benefits in order to classify this traffic light.

The generally accepted definitions for general and special benefits in Missouri are found in the Missouri Supreme Court decision in *State ex rel. State Highway Commission v. Jones*. Special benefits are benefits which "accrue directly and proximately to the particular land remaining by reason of the construction of the public work on the part taken. Such benefits must, of course, be reflected in an increase in the market value of the land." 321 Mo. 1154, 15 S.W.2d 338, 340 (Mo. 1929).

Conversely, general benefits are those benefits which "accru[e] to the owners of property in a neighborhood or vicinity generally [and] inur[ing] to the public as a whole." *Id.* Hence, our courts adhere to the rule excluding general benefits evidence to offset damages in a partial takings case. To otherwise allow an offset for general benefits would effectively require the one whose land was taken to subsidize a project that the rest of the community received at no cost. 3 Nichols on Eminent Domain § 8A.02(1) (3d ed. Rev.2006). *See also Jones*, 15 S.W.2d at 340. Therefore, in order to avoid this kind of unfairness to a landowner, special benefits are narrowly construed. 3 Nichols at § 8A.02(1).

In practice, the application of this distinction between general and special benefits has been identified as "shadowy at best." *Koziatek*, 639 S.W.2d at 88. *See also State ex rel. State Highway Comm'n v. Vorhof–Duenke Co.*, 366 S.W.2d 329, 336

(Mo.1963). Despite this difficulty, three guiding principles in the case law aid our inquiry.

First, just after its decision in *Jones*, the Supreme Court clarified in *State ex rel. State Highway Comm'n v. Young*, "that special benefits are to be differentiated from general benefits by their *nature or kind* rather than by amount or degree." 324 Mo. 277, 23 S.W.2d 130, 135 (1929) (citing *Jones*, 15 S.W.2d at 340) (emphasis added). *See also Vorhof–Duenke*, 366 S.W.2d at 338. The court explained that general benefits likely will not provide the same measure of monetary value to all land in the community. *Young*, 23 S.W.2d at 135.

Second, the definition of special benefits emphasizes 1) the connectivity or physical nexus of the remainder to the improvement, and 2) the location of the taken and improved land as the source or cause of the special benefit. Special benefits "aris[e] from the land's position *directly on the highway improvement," Young*, 23 S.W.2d at 135 (emphasis added), and they accrue "to the *particular land* remaining *by reason of* the construction of the public work *on the part taken," Jones*, 15 S.W.2d at 340 (emphasis added). In contrast, "[g]eneral benefits do not arise by reason of the location of the public work upon land taken." *Gatson*, 617 S.W.2d at 82 (citing *Jones*, 15 S.W.2d at 340).

In other words, special benefits can accrue to the remainder land from an improvement on the taken portion or to other land connected directly to the improvement, but only when those benefits are due to the choice of that specific location for improvement.[3] For example, con-

---

3. Consistent with this we recognize that a benefit may be special even if it is shared by several similarly situated tracts of land. *Jones*, 15 S.W.2d at 340. The court illustrat-

ed this statement with a hypothetical project to widen a road. The project was accomplished through the taking of a strip of land on one side of the existing road. "The owner

struction of a new road on a landowner's property presumptively confers a special benefit on the remainder. *Jones*, 15 S.W.2d at 341; *cf. Koziatek*, 639 S.W.2d at 88 ("severance of a parcel *into* adjoining commercially developed executive park enhanced its value" (emphasis added)). Possible special benefits arising from a new road include "availability for a new or better use, facilities for ingress and egress, improved drainage, sanitation, flood protection, and the like." *State ex rel. State Highway Comm'n, Etc. v. Tate*, 592 S.W.2d 777, 779 (Mo. banc 1980) (citing *Young*, 23 S.W.2d at 135).

▆▆▆▆ Even though land may be directly connected to an improvement, it does not follow that all resulting benefits to that land are special in nature. *See Jones*, 15 S.W.2d at 341 (noting general benefit to remainder land abutting highway improvement, "not arising from its location on the way, but from the facilities and advantages caused by the way, which affect all estates in the neighborhood equally, and which are shared in common with such estates"). Benefits will still be considered general if the land would have received benefits equally had the improvement been made elsewhere in the area, such as facilities for increased traffic flow. *See State ex rel. State Highway Comm'n v. Parker*, 387 S.W.2d 505, 507 (Mo.1965). In essence, what makes a benefit special is its source—the specific location of the improvement which causes the benefit.

▆▆ Finally, Nichols on Eminent Domain offers a third guiding principle to distinguish between general and special benefits by "determin[ing] whether the alleged special benefit has resulted in a vested right." 5 Nichols at § 18.19(1). For example, "benefits attached to the currents of public travel" are not vested rights and therefore not special benefits. *Id.; accord Parker*, 387 S.W.2d at 507 (citing cases).

Applying these three guiding principles, first, the stoplight itself, its movement from one place on a public road to another, and the effect it has on traffic in the area, does not confer a benefit to the Heitz Property that differs in kind or nature from the rest of the properties in that area. The community as a whole benefits from a more efficient regulation of traffic flow.

Second, while it is clear that the widening of the private drive which formed the new Progress Parkway would presumptively bring special benefits to the Heitz Property in light of *Jones* and the remainder property's location directly on the road,[4] the traffic signal itself is a secondary, necessary byproduct of the construction of that road, and thus does not have an independent benefit to the remainder of the Heitz property.[5] We cannot tell from the evidence whether any part of the taken land actually housed the traffic light, though the remainder property is directly connected to the stoplight. Regardless, the stoplight is a facility or advantage caused by the road project. *Id. See also Vorhof–Duenke*, 366 S.W.2d at 339 (in-

cannot complain because his remaining land is charged with a benefit which the widening necessarily confers upon lots on the opposite side." *Id.* In this example, owners on both sides receive a special benefit, including those whose lands were not taken but were directly connected to the improvement.

4.  In fact, the Court allowed the City to specifically present evidence of the roadway as a

special benefit. The City's expert, Ed Dinan, testified that "[the Heitz property] benefited particularly, ... it gains this new roadway which no one else gets."

5.  We also note that even the City's expert, Mr. Dinan, considered the traffic light to be a general benefit to the remainder property.

creased facilities for traffic flow are not a special benefit).

Finally, it does not appear that the placement of a traffic light ever results in a vested right, as municipalities are free to add or remove traffic signals as they see fit. *See State ex rel. Schmitz v. City of St. Louis,* 551 S.W.2d 848, 851–52 (Mo.App. 1977); *Filger v. State Highway Comm'n,* 355 S.W.2d 425, 428 (Mo.App.1962).

The parties argued extensively over this issue at trial. The trial court ultimately concluded that the stoplight itself was not a special benefit, but because special benefits can come in the form of increased access and availability for new and better uses, the trial court permitted the City to talk about those resulting benefits, if any, and to argue they were special benefits. Thus, to the extent the traffic signal contributed to making the land suitable for a higher and better use, the court allowed this evidence and argument,[6] but the trial court did not allow the City to show that the stoplight was an independent special benefit in and of itself. This is consistent with Missouri law and with the process a trial court is to follow in admitting benefit evidence in a partial takings case.

Point denied.

### Point II

■ The City argues in Point II that the trial court abused its discretion in admitting the testimony of Charles Drury, Jr., because Owners did not disclose Mr. Drury, Jr., as an expert witness. Owners respond that Mr. Drury, Jr., did not offer expert testimony. We agree.

■ Witnesses who testify based upon their personal knowledge and involvement in a case, who have not been engaged by a party in anticipation of litigation, are not "expert witnesses" within the meaning of Rule 56.01(b)(4), even "[i]f some of their testimony incidentally call[s] upon their learning and experience for conclusions and opinions." *Owen v. City of Springfield,* 741 S.W.2d 16, 20 (Mo. banc 1987).

Mr. Drury, Jr., testified that he has been involved in developing many Drury Hotels from the ground up, and that he was personally involved in conversations with his father, Charles Drury, Sr., and Mr. Heitz that led to the development of the Drury Hotel presently on the Heitz property. Mr. Drury, Jr., also testified that he has been involved in converting older Drury Hotels into Pear Tree Inns and then constructing new Drury Hotels adjacent to the Pear Tree Inns; the same plan that the Drurys and Mr. Heitz contemplated for the Heitz Property. Mr. Drury, Jr., told the jury how that plan would have been implemented in terms of the land and easements required. Then

---

6. The trial court permitted the City's experts to refer to the stoplight on occasion when discussing the increase in value of the Heitz Property. Mr. Dinan stated the traffic light benefited the Heitz Property because it better allowed for traffic going in and out of the property. Mr. Mullenix stated that signalization was a special benefit to the Heitz Property, in part because "there's a ton of uses new [sic] that you can put on this property." Mr. De Santis testified the after condition of the Heitz Property was better in part because "you can get in and out of the property with the stoplight." The trial court also permitted the City to argue there was a stoplight "only for this property."

Furthermore, Owners specifically submitted a withdrawal instruction regarding the stoplight, which stated "evidence of the traffic signal at Dorsett Road and the relocated Progress Parkway is withdrawn from the case and you are not to consider such evidence in arriving at your verdict." The trial court denied this instruction. If anything, the trial court's denial of this instruction allowed the jury to take into consideration the traffic light as a special benefit to the extent there was evidence in the record to that effect.

Mr. Drury, Jr., stated that since the City's condemnation, he is no longer interested in pursuing the development of a new hotel on the Heitz Property. When asked why, he said that based on his experience in the hotel business and these development projects, he would not choose to build a hotel on land as narrow as the remaining Heitz Property along Dorsett Road.

While Mr. Drury, Jr., did offer testimony that incorporated his experience as a developer, his testimony consisted substantially of his dealings with Owners over the course of their partnership concerning this particular piece of land, and his opinion regarding the particular hotel he had contemplated developing there. His experience gave insight to his reasoning for changing his mind regarding this property. However, he was not engaged by Owners in anticipation of litigation, and he was not asked to offer an opinion in general about the feasibility of putting any hotel on the remainder property. Rather, he was called to describe his years-long relationship related to the Heitz Property, and how his specific notion of further development of a Drury Hotel on this property has been affected by the City's partial taking. The trial court did not abuse its discretion in admitting Mr. Drury, Jr.'s, testimony as that of a fact witness. Point denied.

### Point III

The City argues in its third point that the trial court abused its discretion by admitting Rich Obertino's testimony concerning hypothetical architectural plans for the Heitz Property before the taking. The City argues this testimony lacked foundation, because Mr. Obertino did not establish a likelihood that the Heitz Property would be rezoned to allow for development of these hypothetical plans. We disagree.

Mr. Obertino testified he is vice president of TRI Architects, and has 17 years of experience as an architect. He works on design and development of private retail establishments, and several of these have been in the City of Maryland Heights. On direct examination, Mr. Obertino testified about plans he had prepared for the Heitz Property. He was asked to analyze the site as if Mr. Heitz was a client requesting recommendations about the best use for the property. Mr. Obertino formulated six options for the Heitz Property before the taking, including in each option a hotel on the site paired with another establishment such as a drugstore or restaurant. He also testified that after the taking, none of his development options would be feasible on the remaining land.

It is permissible for an expert to testify to hypothetical plans that could show the feasibility of a particular use of a plat of land. *See State ex rel. Mo. Highway & Transp. Comm'n v. Modern Tractor & Supply Co.*, 839 S.W.2d 642, 649 (Mo.App. S.D.1992). Additionally, a jury should take into account when determining damages "all the uses to which the property may be best applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future." *Id.* at 650.

But if an expert is giving an opinion regarding the probability that a property would be rezoned, it must be based on a proper foundation. *State ex rel. Mo. Highway & Transp. Comm'n v. Gannon*, 898 S.W.2d 141, 143 (Mo.App. E.D.1995). Similarly, opinions as to the value of a property must not be based on "mere conjecture, speculation or unwarranted assumption." *State ex rel. Missouri Highway & Transp. Com'n v. Edelen*, 872 S.W.2d 551, 555 (Mo.App. E.D. 1994). Yet, as a rule, "questions as to the

sources and bases of the expert's opinion affect the weight, rather than the admissibility of the opinion, and are properly left to the jury." *Gorham*, 335 S.W.3d at 593 (internal quotations omitted).

Here, Mr. Obertino presented options for the best use of the Heitz Property, based on his years of experience as an architect developing sites in Maryland Heights. He did not testify on direct examination whether he believed the Heitz Property would be zoned for each option accordingly. He also did not give an opinion as to the value of the property before or after the taking. Thus, the trial court did not abuse its discretion in allowing Mr. Obertino's opinion regarding the best use of the Heitz Property.

On cross-examination, the City elicited Mr. Obertino's opinion regarding probable zoning, and now argues that his entire testimony lacked foundation. While it is true that an opinion regarding the probability of zoning must be based on certain foundational data, it is also true that the City may not now raise this objection when the City itself brought forth his opinion on these matters.

Furthermore, the City took advantage of its opportunity to cross-examine Mr. Obertino and to challenge the soundness of his factual bases. The City also was able to present its own evidence showing that zoning was not probable. It was ultimately for the jury to decide based on what was presented whether the uses Mr. Obertino proposed were in fact the best uses and should be considered when determining damages. *See State ex rel. Mo. Highway & Transp. Comm'n v. Pedroley*, 873 S.W.2d 949, 954 (Mo.App. E.D.1994). The jury was able to assign its own weight to Mr. Obertino's testimony on the question of whether in this hotel-laden area of town, a hotel plan would have been approved by the City. Point denied.

## Point IV

■■ The City argues that the trial court abused its discretion in admitting the valuation testimony of Steve Tharpe based on comparable sales in that his opinion lacked foundation. We disagree.

■■ In order to lay the proper foundation for an expert's opinion, Section 490.065.3 RSMo. (2000) requires that the underlying facts or data upon which an expert forms an opinion "must be of a type reasonably relied upon by experts in the field . . . and must be otherwise reasonably reliable." Additionally, in the area of land valuation by comparable sales, experts may rely on hearsay sources to form the basis of their opinions, because those facts are not offered as independent evidence of property value. *State v. Barron*, 400 S.W.2d 33, 37–38 (Mo.1966). An expert should make careful inquiry into the facts he or she relies upon. *Id.*

Therefore, assuming those carefully examined facts are of the type reasonably relied upon by experts in the field and are otherwise reasonably reliable, then an expert's opinion based upon them is admissible. *See State ex rel. Mo. Highway & Transp. Comm'n v. Sisk*, 954 S.W.2d 503, 509 (Mo.App. W.D.1997) (citing *State ex rel. MHTC v. Matula*, 910 S.W.2d 355, 358–59 (Mo.App. E.D.1995)). Beyond that, we state again that questions regarding the factual bases for an expert's opinion affect the opinion's weight rather than its admissibility. *Gorham*, 335 S.W.3d at 593.

■■ It is unclear the exact inquiry an expert must make to verify comparable sales facts relied upon in order to satisfy the foundational standard. *Sisk*, 954 S.W.2d at 508. It is settled that an expert's opinion based on comparable sales data which have been verified by the buyers, sellers, or brokers involved will have

sufficient foundation, though verification need not necessarily come from one of those parties. *Id.* (citing *State ex rel. State Highway Comm'n v. Jasper*, 544 S.W.2d 554, 555 (Mo. banc 1976)). On the other hand, an appraiser may not rely simply on facts from some unknown person in his office. *Sisk*, 954 S.W.2d at 509 (holding one appraiser's opinion based on another appraiser's facts concerning sale, when seller at issue would neither confirm nor deny those facts, did not have proper foundation).

Here, Mr. Tharpe testified that the bases for his opinion included his own examination of the Heitz Property, his 34 years of experience valuing land, and data contained in a report he compiled of comparable sales in the area. He had talked with colleagues, appraisers who assembled the sales, and brokers involved in the sales he listed in his report. Mr. Tharpe shared the names of each of his sources and their relation to the sales in each instance. He also obtained comparable sales data from a real estate services firm and a land survey he conducted of business park sales in the area. For each of the sales listed, Mr. Tharpe testified that he confirmed they took place at the listed price. The City had ample opportunity to undermine Mr. Tharpe's opinion by attacking the factual bases through cross-examination.[7]

Under such circumstances, we find no abuse in the court's decision to admit Mr. Tharpe's opinion testimony. Point denied.

### Point V

■ In Point V, the City argues that the trial court abused its discretion by failing to strike evidence of a comparable sale offered by Owners' expert, Tom McReynolds, in that it lacked foundation. We disagree.

Mr. McReynolds testified that in his opinion, the front portion of the Heitz Property before the taking was worth $22 per square foot. He based this on data from two comparable properties, one which was sold and another which was leased. The City disputes the foundation of the latter comparable data. Regarding that data, Mr. McReynolds testified that the landlord and tenant of the leased property came to agreement on the value of the property, which they listed in the lease and used to determine the monthly rent figure. Mr. McReynolds used that value, and the fact that the property was comparable to the front portion of the Heitz Property, in arriving at his opinion as to the value of that front portion of the Heitz Property. He also testified that relying on lease terms is an accepted practice of appraisers in valuing land.

Historically, Missouri has not allowed experts to share opinions of land value which are based on computations of rental terms of comparable land.[8] *State ex rel. State Highway Comm'n v. Scott*, 544 S.W.2d 340, 342 (Mo.App.1976) (citing *Vorhof–Duenke*, 366 S.W.2d at 340). However, in 2006, the legislature amended the definition of "fair market value" in con-

---

7. A point made on cross-examination and also again here is that though Mr. Tharpe based his opinion in part on comparable sales to CVS Drugstores, he did not discuss with CVS representatives whether they would have sought to acquire the Heitz Property for a CVS store. While inquiries into the facts of comparable sales are required, we do not see as part of the comparable sales approach that

it is necessary for an expert to verify whether sale of the subject property to a particular party would be likely.

8. We do note the distinction here that the total value of the land was listed in the lease, and it was not solely a computation from the monthly rent that formed the basis of Mr. McReynolds's comparison.

demnation proceedings. The current definition includes consideration of "the value of the property based upon its highest and best use, using generally accepted appraisal practices." § 523.001 RSMo. (Supp. 2008). This is also consistent with the foundational standard discussed above requiring the underlying facts or data forming the basis of an expert's opinion to be of a type reasonably relied on by experts in the field.

Because Mr. McReynolds established it was a generally accepted appraisal practice to use a leased property in this manner, the trial court's allowance of this evidence was in keeping with Section 523.001. Similarly, Missouri Approved Instruction 9.02, revised in 2008 to reflect the language of Section 523.001, which was given in this case, also instructs the jury that they "may consider evidence of the value of the property including . . . generally accepted appraisal practices."

The trial court did not abuse its discretion by admitting Mr. McReynolds' opinion based on comparable sales, as he arrived at his opinion using generally accepted appraisal practices. Point denied.

### Point VI

In this point, the City claims that the trial court erred in overruling the City's motion for new trial, in that the cumulative effect of the court's rulings listed in the previous points relied on, and added to in this point relied on, enflamed the jury against the City and was so prejudicial as to deprive the City of a fair trial. We disagree.

We have already found that the trial court did not abuse its discretion in any of its rulings contested in previous points. The City was not prejudiced by any of these rulings. The City now asks us to consider two additional rulings—both of them on objections to questions Owners' counsel asked on cross-examination—and to determine that their cumulative effect was to so prejudice the City as to require a new trial.

The context for both of these contested rulings included Owners stating a dollar figure related to another property and the City objecting because it was not proper as data from comparable properties. In both instances, the data was not used to influence the fair market value determination of the Heitz Property through a comparison, but rather to undermine the City's experts by showing bias. In one instance, the trial court did sustain the City's objection as to the injection of a monetary amount.[9]

To enable fair cross-examination, it is permissible to use evidence that is relevant and material for impeachment purposes, even if the same evidence would be inadmissible for another purpose. *Houfburg v. Kansas City Stock Yards Co. of Maine*, 283 S.W.2d 539, 548–49 (Mo. 1955). Here, Owners' purposes in using the evidence for cross-examination were proper. The court upheld the cross-examination for impeachment purposes and excluded the dollar amount that was improper in achieving that purpose. Viewing the record as a whole, we cannot see that these two rulings caused a level of jury inflammation or prejudice such that the

---

**9.** The City's complaint is actually that the trial court did not ask the jury to disregard the improper information. From the transcript, it is difficult to fully understand the exchange, but it is clear the trial court understood the figure should not have come in:

THE COURT: The Court will sustain only to the actual numbers.
MS. GILROY [counsel for the City]: Ask the jury to disregard.
THE COURT: On Drury.
MS. GILROY: Ask the jury to disregard.

verdict was not a reflection of a fair trial, including careful consideration of all of the evidence. Additionally, the damages were the result of conflicting evidence and within the limits of proof. *See Ellis,* 382 S.W.2d at 236–37. Point denied.

### *Point VII*

■ Finally, the City asks us to review Owners' closing argument for plain error under Rule 84.13(c). "The general rule is that where a party does not object to argument he deems improper he may not thereafter object on appeal; and the plain error rule may be resorted to only in those exceptional circumstances when the reviewing court deems that manifest injustice or miscarriage of justice has occurred." *Goodman v. Firmin Desloge Hospital,* 540 S.W.2d 907, 917 (Mo.App. 1976).

We see no such manifest injustice in the jury's verdict, and we decline to exercise plain error review to remedy the City's failure to timely and properly object. *See Sansone v. Londe,* 753 S.W.2d 339, 341 (Mo.App. E.D.1988). Point denied.

### *Conclusion*

None of the City's points on appeal show an abuse of discretion on the part of the trial court in this matter, nor do they convince us that the City suffered manifest injustice. We affirm.

CLIFFORD H. AHRENS, P.J., ROY L. RICHTER, J., concur.