ESTATE of Ray F. PEARL, Appellant,

v.

DIRECTOR, MISSOURI STATE DIVISION OF WELFARE, Respondent.

No. KCD 27615.

Missouri Court of Appeals, Kansas City District.

July 6, 1976.

James Gramling, Legal Aid and Defender Society of Greater Kansas City, Inc., Kansas City, for appellant.

Robert R. Northcutt, Chief Counsel, Paul T. Keller, Counsel, Missouri Division of Welfare, Jefferson City, for respondent.

Before SHANGLER, P. J., SWOFFORD and SOMERVILLE, JJ.

SHANGLER, Presiding Judge.

This action is to review affirmance by the circuit court of an order of the Director of the Missouri State Division of Welfare which denied old age assistance benefits to Ray F. Pearl. It was found by the Director that the claimant had available resources compatible with decency and health and was not in need according to the statutory prescription of § 208.010, RSMo 1969, for public assistance.

The claimant Ray F. Pearl, an elderly paralytic at the commencement of the proceedings, died during the hearing and in due course his surviving spouse, Opal Pearl, was nominated the real party in interest. The claim of his estate, therefore, is limited to retroactive benefits from June 1972, when application was made, through December of 1972, when he died.

The denial of assistance was based on Rule 13 adopted by the Division of Welfare which promulgates:

> When an applicant or recipient of Old Age Assistance . . . owns real property which is not furnishing shelter for him, and its . . . current market value is . . . more than $2,000 if owned by a married person living with spouse, it shall be considered a resource and the claimant will not be eligible for assistance on the basis of need.

There was evidence that the claimant and his wife owned two vacant lots. These were appraised by the Department of Welfare to have the current market value of $2,200. On this testimony, the Director found that the claimant had an available resource and thus was not in need of public assistance. The claimant disputes the competency of the appraisal evidence and the validity of the order which issued on it.

The property in contention had been purchased by the claimant and his wife as homesites. The first parcel, a lot with a front of 35 feet and depth of about 132 feet located at 4904 Montgall, was acquired in 1957 for $650. For some reason, they found that site unsuitable and abandoned their purpose to build there. About ten years later, they purchased another lot for $1000, a 40 foot frontage with a depth of about 106 feet, located at 31st and Oakley, but that lot also remained vacant. In the intervening years, the Pearls attempted to divest themselves of the property but were unable to sell it even for the $400 they were willing to accept. Then, several weeks before the hearing they once again attempted to sell the Oakley lot, this time to the couple from whom they had purchased it

for $1000, but did not do so when they received an offer of only $100.

The claimants presented the testimony of Ray Powell, real estate broker and appraiser. He described the municipal zoning regulations for home construction to prescribe a minimum lot frontage of 50 feet and a total land dimension of 5000 square feet. These were also the basic requirements for an FHA home building loan. These conditions could not be met by either lot unless combined with an adjacent property, thus neither the Oakley nor Montgall property enjoyed a highest and best use for residential purposes.

As to the Oakley property, numerous vacant lots of comparable dimension have been sold through the Land Trust for about $150; some of them were acquired by the witness himself. No less than 25 other vacant tracts have remained unused and inactive for a number of years. The Oakley lot was of no commercial value because the size was insufficient and the zoning adverse. He accorded a fair market value of $100 to the property.

The Montgall property, of comparable dimension as the other, suffered from even additional market disadvantages. Vandalism was rampant in the area and the lot was in the path of a proposed freeway and subject to a partial taking. The threats of wanton destruction by vandals and the taking by condemnation would tend to discourage construction loans for the property. In the judgment of the witness the condemnor would be willing to pay 25 cents per square foot on the eventual partial taking of the lot, but an immediate purchaser—for whom the venture would be speculative—would be expected to pay only a fraction of that amount. The witness attributed a fair market value of $100 to $150 to the property.

The value evidence of the Division of Welfare was given by the testimony of appraiser Fred L. Hunt. He had inspected the Oakley and Montgall lots and by means of the comparable sales method, arrived at a value of $1,200 for the Oakley lot and $1,000 for the Montgall property.

It was the opinion of appraiser Hunt that the highest and best use of both the Oakley and Montgall property was for residential purposes, although there was some possibility of commercial use for the Oakley parcel. He conceded that the lots did not comport with the current municipal zoning regulations for residential use, but surmised that since the plats preceded the current regulations, building permits would not be refused.

Despite this testimony, the written report of appraisal filed by Hunt with the Division of Welfare and received as an exhibit in the cause explicitly remarks that "[c]ommercial use for subject [Oakley lot] is very speculative due to its small size". It is also plain from that exhibit that of the three properties used as comparable sales for the derivation of the value of the Oakley lot, two were of improved properties, and the other a vacant lot with a frontage of 98 feet.

The market value of $1000 attributed by the appraiser to the Montgall lot was based on a comparison with three unimproved lots with frontages of 84 feet, 99 feet and 42 feet respectively. All three involved sales about six years before the litigation and none was a property in the path of the South Midtown Freeway.

The opinion of value tendered by the Division of Welfare on both properties rested on the assumption of the appraiser-witness that the Pearls would not be denied a permit for residential construction on the lots. This opinion was tempered with the concession that he knew of no instance within recent years of a residence built within the city on a property with a frontage of less than fifty feet.

■ The scope of review in such cases is to determine whether the findings and decision of the Director are supported by competent and substantial evidence upon the whole record and are otherwise authorized by law. *Hill v. State Department of Public Health and Welfare*, 503 S.W.2d 6, 10[2] (Mo. banc 1973). Substantial evidence within this reference means evidence from which the trier of fact may harmoniously

find the issue. If the inference drawn requires the assumption of facts beyond the record, the decision is not supported by substantial evidence. *Davis v. State Department of Public Health and Welfare,* 483 S.W.2d 775, 777[1, 2] (Mo.App.1972).

The market value of a parcel of property may be estimated according to the uses for which it is suitable, with due regard to existing business or community wants, or such as may be reasonably expected in the immediate future. This means only that the highest and best use to which the property is adaptable bears as an element of present value. But a mere possible or imaginary use does not tend to establish market value and remains speculative on that issue. *Union Electric Company of Missouri v. McNulty,* 344 S.W.2d 37, 40[4] (Mo.1961).

The character and market value of a tract of land may be shown by comparison with the condition and value of similar nearby property. The comparability of other properties depends not only on their proximity in time but also upon similarity in location and the uses to which the properties may be adaptable. *City of St. Louis v. Buselaki,* 336 Mo. 693, 80 S.W.2d 853, 856[5] (banc 1935). It is for the trier of fact to determine whether the parcels compare sufficiently to bear on the issue of value; where no reasonable basis for comparison exists, of course, there is no competent proof of value. *City of St. Louis v. Vasquez,* 341 S.W.2d 839, 850[26, 27] (Mo.1960).

The denial of public assistance to the Pearls was on the determination that they had available resources in excess of $2000. That finding rested on the evidence of appraiser Hunt who gave the opinion that the Oakley and Montgall lots had a $2200 market value for residential use. The opinion was formed by comparison with sales of improved residential property and with lots of sufficient frontage [save one discussed *infra* ] to comply with municipal regulations for home construction. This evidence of comparable sales was not competent to prove the value of the Pearl lots for two reasons.

The first of the reasons: Our law considers vacant land and improved lots dissimilar and the market value of one cannot be derived from a comparison with the market value of the other. *State v. Galeener,* 402 S.W.2d 336, 342[9] (Mo.1966); 85 A.L.R.2d 139, Anno.: Real Property—Value —Evidence. A cognate principle holds that improvements ordinarily have no market value separate from the land. Nichols, Law of Eminent Domain, § 13.11. Improvements affixed to the land become part of the realty, thus the issue is the market value of the land with the buildings and structures affixed. Accordingly, it is improper to determine the value of the improvements separate from the value of the land. *City of St. Louis v. Turner,* 331 Mo. 834, 55 S.W.2d 942, 944[1] (1932); 1 A.L. R.2d, Anno.: Eminent Domain—Valuation as Unit. The law disfavors such separate computations because they are theoretical, not fairly relevant on market value, and tend to confuse on that issue. Nichols, Law of Eminent Domain, § 13.1; *Forest Preserve Dist. v. Alton R. Co.,* 391 Ill. 230, 62 N.E.2d 701, 703[4, 5] (1945). The appraiser for the Division of Welfare estimated the value of the vacant Oakley lot by resort to comparisons with two lots improved by structures, by subtraction of the supposed value of the structures from that of the lots—a formula the law does not allow. To the extent the opinion of value of the Oakley lot rests on such calculations, it rests on evidence clearly incompetent.

The second of the reasons: All the evidence was that the municipal and FHA regulations approved residential construction only on a lot with minimum frontage of 50 feet and total dimension of 5,000 square feet. Each of the vacant lots [save one] used by the Welfare appraiser for comparison was at least 84 feet in frontage— thus enjoyed a highest and best use for residential construction—but was dissimilar in physical characteristic and adaptability to the Oakley and Montgall properties. *State v. Galeener, supra,* l.c. 342[9]; *City of St. Louis v. Vasquez, supra,* l.c. 850[26, 27]. Of the six properties used by the Welfare

appraiser to derive the values of the Pearl lots, only one—a vacant lot on Walrond with 42 front feet but unspecified depth—did not meet the minimum dimension requirements of municipal and FHA residential standards and thus was similar in essential physical characteristic and adaptability to the Montgall property to which it was compared.

The opinions of value tendered by the Division of Welfare rested on the assumption of their appraiser-witness that the Pearls, whose lots were platted before the imposition of the frontage requirement for residential construction by municipal legislation, could not be legitimately required to conform. In the words of witness Hunt: "[T]hese were platted [before the imposition of the 50 foot frontage requirement] . . . I understand that they legally cannot refuse a building permit . . . [Y]ou are a lawyer, you ought to know more about that than I do . . . [T]here is always some arguments to that but I am appraising on the basis that they can get a permit and I firmly believe that they can. They may have a little trouble and may have to go to bat, but I think, in my opinion, they can. From all the information I get from the Zoning Commission, they can get it."

■ We recognized in *State ex rel. State Highway Commission v. Carlson,* 463 S.W.2d 74, 78 (Mo.App.1970) that our jurisprudence accepts the way of the marketplace in the determination of land value. It recognizes that an ordinarily prudent man gives account to hearsay information to arrive at the market value of property he is about to purchase. Accordingly, hearsay and best evidence rules are not applied to prevent an expert witness from giving the basis of his opinion of value. *State Highway Commission v. Bloomfield Tractor Sales, Inc.,* 381 S.W.2d 20, 24[1, 2] (Mo.App. 1964); 12 A.L.R.3d, 1065, § 2[2]. Anno.: Hearsay—Land Value—Other Sales. This is so because ordinarily the facts given by an expert in evidence as the basis of his opinion of value come with sufficient mark of trustworthiness to justify relenting from the traditional rules of evidence. *State ex rel. State Highway Commission v. Carlson, supra,* l.c. 78; *United States v. 5139.5 Acres of Land, etc.,* 200 F.2d 659, 662[8] (4th Cir. 1952). Within this prescription, it is hearsay of facts which is acceptable, not hearsay as to law. *City of St. Louis v. Kisling,* 318 S.W.2d 221, 225[7, 8] (Mo.1958).

■ The only evidence which supports the value opinion of expert Hunt is not a conclusion of fact but a conclusion of law: that because of the priority of the plats the Pearls could not legally be refused a building permit by the municipality. This evidence was not probative of market value. Thus, none of the evidence given by the Division of Welfare was competent proof on that issue. Even were the legal opinion otherwise admissible, that would not be substantial proof that the Pearl lots enjoyed the highest and best use for dwelling purposes in face of the unquestioned requirement by the FHA of a fifty foot frontage for residential construction loans.

Actually, the only legal evidence of market value was the testimony of Mrs. Pearl that after the death of her husband she sold both lots to a real estate broker for a total of $450 and the testimony of her appraiser Powell that the Oakley lot was then worth $100, and the Montgall lot, $150.

The denial of assistance was based on the finding that the Pearl lots were an available resource in excess of $2000. This conclusion rests on a determination of value which is without support in substantial evidence, assumes facts not proved, and is conjectural.

Accordingly, the judgment of the circuit court is reversed and the cause is remanded with directions that the cause be further remanded to the Director of the Missouri State Division of Welfare for redetermination.

All concur.