**STATE of Missouri, ex rel., MISSOURI HIGHWAYS AND TRANSPORTATION COMMISSION, Respondents,**

v.

**1811 NORTH BROADWAY, LLC, et al., Appellants.**

**No. ED 98682.**

Missouri Court of Appeals,
Eastern District,
Division Five.

June 11, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied July
24, 2013.

Tracy Hunsaker Gilroy, Scott R. Hunsaker, St. Louis, MO, for appellant.

John W. Koenig, Jr., Paul Sterrett, Rich Tiemeyer, Sikeston, MO, for respondents.

GARY M. GAERTNER, JR., Chief Judge.

### Introduction

This appeal concerns a partial taking of private property in the City of St. Louis (City) as part of a government project to construct a new Mississippi River Bridge (bridge project). Appellant 1811 N. Broadway, LLC, argues that the expert appraiser for Respondent Missouri Highways and Transportation Commission (Commission) improperly relied on sale prices of land that had been influenced by the bridge project when determining the value of the property taken pursuant to condemnation. Appellant argues this caused the jury to return a verdict that did not justly compensate Appellant for its loss. We reverse and remand for a new trial.

### Background

The property at issue here is located at 1811 North Broadway in the City of St. Louis (1811 Property). This 1.68–acre property was made up of two adjacent parcels separated by Brooklyn Avenue: a triangular parcel to the north and a rectangular parcel to the south. The Commission condemned the rectangular parcel as part of the bridge project, taking approximately half an acre of land. The triangular parcel remains intact.

Also related to this property, though not directly a subject of this case, is a 2.48–acre property (Archview Property) on the south side of and adjacent to the rectangular parcel of the 1811 Property. The Commission also condemned the Archview Property as part of the bridge project. The trial for damages regarding the Archview Property was a separate distinct action that took place before the trial in our case.

The history of these properties in the condemnation actions involved a corporation named 1811 North Broadway, LLC (1811 LLC), which was made up of members Daniel McGuire (McGuire), president of McGuire Moving & Storage, James Lindsay, and Randy Heil (Heil). 1811 LLC purchased the 1811 Property in 2002. A building (1811 Building), previously used as a truck terminal, sat on the triangular parcel of the 1811 Property in 2002 at the time of purchase. Heil owned a machine shop business, which used the 1811 Building. 1811 LLC also leased part of the 1811 Building to a bus storage company.

In 2006, 1811 LLC purchased the Archview Property from the Land Reutilization Authority of the City of St. Louis. 1811 LLC had a plan to develop both the Archview Property and the 1811 Property into a 400–unit self-storage facility, which the City's alderwoman for this ward had approved before the sale took place. The self-storage construction was to occur in three phases. The first phase would occur on the Archview Property, and the second phase involved the rectangular parcel of the 1811 Property. The storage business was to begin operating out of the first

storage units built on the Archview Property and then expand as construction continued. The final phase would extend the storage facility into the triangular parcel of the 1811 Property. It would include tearing down the 1811 Building and putting storage units in its place. Until the third phase of construction, which required removal of the 1811 Building, Heil planned to use the 1811 Building as an office from which to manage the construction and storage business in its early stages in addition to using it for his machine shop. Heil also anticipated that the 1811 Property's proximity to a McGuire Moving & Storage[1] location a few blocks away would be positive for 1811 LLC's growing business, because McGuire would refer customers who were interested in self-storage.

Between 2006 and 2008, 1811 LLC[2] made progress toward the first two phases of its plan. This included work on the infrastructure to prepare the sites for the storage buildings, as well as putting concrete pads and storage buildings on the Archview Property. 1811 LLC also constructed a fence that enclosed both the Archview Property and the rectangular portion of the 1811 Property. Shortly after business opened on the Archview Property, the Missouri Department of Transportation notified 1811 LLC that the bridge project would require condemnation of the Archview Property and the rectangular parcel of the 1811 Property. Because of this, 1811 LLC agreed to stop its operation and expansion of its storage facility. Approximately one year later in 2009, the Commission took the Archview

---

1. McGuire testified that McGuire Moving & Storage provided warehouse storage.

2. At some point during this time, Daniel McGuire turned over his interest in the Archway Property to his son, Josh McGuire. Additionally, Jim Lindsay did not have an own-

ership interest in the Archview Property. To diminish confusion, we continue to refer to the owner of both properties as 1811 LLC, but when used in reference to the Archview Property, "1811 LLC" includes only those members who also owned the Archview Property.

Property. Then, the Commission took the 1811 Property on February 17, 2010.

The trial for damages involved in the taking of the rectangular parcel, which is the subject of the present appeal, took place in April of 2012. Regarding the value of the property before the taking, the jury heard testimony from McGuire and Heil regarding their plans for the property and its value. McGuire testified that in his opinion as the owner and someone who had been in the storage business for many years, the value of the property taken was $22 per square foot. 1811 LLC then presented the expert testimony of Bradley North, a self-storage consultant, and Sheldon Johnson, a commercial real estate broker. These experts testified that they performed feasibility studies for self-storage and concluded that self-storage was an economically feasible use of the property. Sheldon Johnson testified self-storage was the highest and best use of the property. He valued the 1811 Property at $20 per square foot before the taking and concluded just compensation for the land taken was $1.25 million.

The Commission then presented testimony from two real estate brokers, Peter Ingersoll and Richard Shepard. Both experts opined that self-storage was not the best use for the 1811 Property. Peter Ingersoll believed the risks related to not generating enough business for self-storage outweighed the possible rewards at that location, including the Archview Property. Richard Shepard had visited the 1811 Property during the month before trial, in March of 2012. He observed that the rectangular portion of the property was vacant, fenced, and any use of the

property was being destroyed by construction of the bridge project. He testified that the highest and best use of the property was industrial, both before and after the taking. He opined that the semi-retail nature of self-storage was not sustainable there due to lack of retail and exposure in the area.

Additionally, the Commission offered the testimony of a real estate appraiser, Ronald Metcalf (Metcalf). Metcalf had also viewed the property during the month before trial in 2012, and he agreed that the highest and best use of the 1811 Property, both before and after the taking, was industrial. He believed a commercial self-storage use was too speculative for this property. He concluded that the 1811 Building should not be torn down, but rather the highest and best use would be to utilize the 1811 Building. He testified that there were similar buildings being used successfully in the area as industrial buildings. Metcalf performed comparable sales analyses to value the whole property before the taking and the remaining triangular parcel after the taking, in order to calculate damages. He determined that the value of the 1811 Property both before and after the taking was $4 per square foot. He concluded that just compensation for 1811 LLC's loss, including the land taken, the lost ability to vacate Brooklyn Avenue,[3] and the cost of the fence around the rectangular parcel, was $139,000.

1811 LLC's counsel objected several times during Metcalf's testimony, arguing that his opinion was inadmissible because his determination of the property's value before the taking was impermissibly based on comparable sales that took place after

---

3. Metcalf included this in his calculation of damages because Brooklyn Avenue was in between the triangular and rectangular parcels of the 1811 Property, and as such, had a reasonable likelihood of being vacated and added to the 1811 Property. With the taking of the rectangular parcel, 1811 LLC no longer owned property on both sides of Brooklyn Avenue and thus lost the ability to vacate it.

the date of the taking and that were influenced by the bridge project. The trial court allowed the jury to hear Metcalf's opinion of value. The jury awarded compensation in the amount of $180,000. This appeal follows.

## Standard of Review

We review a trial court's rulings on admission or exclusion of evidence for abuse of discretion. *Del–Mar Redev. Corp. v. Associated Garages, Inc.*, 726 S.W.2d 866, 869 (Mo.App. E.D.1987). We will not reverse such a ruling unless we find a substantial and glaring injustice has occurred. *Id.* We review any legal conclusions by the trial court *de novo. City of Maryland Heights v. Heitz*, 358 S.W.3d 98, 104 (Mo. App. E.D.2011).

## Discussion

1811 LLC's sole point on appeal is that the trial court abused its discretion in admitting Metcalf's opinion because under the project influence doctrine, Metcalf's opinion of the value of the 1811 Property before the taking was inadmissible. We agree.

In a partial taking, as here, an owner is entitled to just compensation not only for the value of the land taken, but also for any damage to the remainder. *Heitz*, 358 S.W.3d at 105. The damages are calculated by determining the fair market value of the whole property immediately before the taking and subtracting the fair market value of the remainder immediately after the taking. Section 523.001, RSMo. (Supp.2008); *Heitz*, 358 S.W.3d at 105. Fair market value is traditionally defined as the amount a reasonable willing buyer would pay and a reasonable willing seller would accept, when neither is compelled to enter the transaction. *Land Clearance for Redev. Auth. of City of St. Louis v. Henderson*, 358 S.W.3d 145, 150 (Mo.App. E.D.2011). Furthermore, the "landowner is entitled to the fair market value of the land at its highest and best use." *Id.* (quoting *City of St. Louis v. Union Quarry & Constr. Co.*, 394 S.W.2d 300, 305 (Mo.1965)).

Therefore, the first step an appraiser takes in determining fair market value is to determine the highest and best use (HBU) of the land. *See Union Quarry*, 394 S.W.2d at 305. Then, one permissible method for establishing the fair market value of the land at its HBU is to offer evidence of sales of comparable land with similar uses in the area. Section 523.001. Comparable sales are "voluntary sales of other similar property made in the same general vicinity and not too remote in time to the date of the taking." *Quality Heights Redev. Corp. v. Urban Pioneers*, 799 S.W.2d 867, 870 (Mo.App. W.D.1990) (quoting *State ex rel. State Highway Comm'n v. Berkeley Sch. Dist.*, 618 S.W.2d 195, 197(Mo.App. E.D.1981)).

This comparable sales method of determining value, however, may be subject to the project influence doctrine. This doctrine holds that the jury may not consider "either enhancements or depreciation brought about by the construction of the improvement for which the property is being taken." *St. Louis Elec. Terminal Ry. Co. v. MacAdaras*, 257 Mo. 448, 166 S.W. 307, 310 (1914). In adopting this doctrine, the Missouri Supreme Court went on to say, "[i]n other words, the value should be determined independent of the proposed improvement." *Id.*

The dual purpose of this rule is first to safeguard the government from paying a premium price for land that would not have been valued so high but for the planned government project's enhancement of land value in the area. Second, even more crucial to individual property

rights, the rule exists to protect citizens who own private property from being penalized by receiving depreciated compensation for their land that would not have been so low but for the fact that the project will cause land prices in the area to fall. *See U.S. v. Reynolds,* 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970); 4 NICHOLS ON EMINENT DOMAIN § 12B.17(8)(b) (3d ed. Rev.2006). The landowner is entitled to just compensation for his or her land in its condition at the time it is taken, so that the landowner is made whole monetarily, as if the taking had not occurred. *Reynolds,* 397 U.S. at 16, 90 S.Ct. 803; *Clay County Realty Co. v. City of Gladstone,* 254 S.W.3d 859, 863 (Mo. banc 2008). Therefore, the project influence doctrine essentially operates to render any evidence of value that is influenced by the forthcoming government project irrelevant to the question of the value of land without the project, and thereby irrelevant to the question of damages. *See Wertz,* 478 S.W.2d at 677 (stating issue is whether comparable sale "has been so affected by the object of the condemnation ... that the subsequent sales evidence is substantially lacking in probative value upon the issue ... [of] damages").

This raises the question of the trial court's role in admitting potentially project-influenced evidence. The general rule regarding admission of evidence of value, including comparable sales, is that a trial court should admit any evidence tending to shed light on the value of a particular piece of property, and then it is the jury's task to assign proper weight to each piece of evidence and award damages that represent the value of the land taken. *Kansas City Power & Light Co. v. Jenkins,* 648 S.W.2d 555, 562 (Mo.App. W.D.1983); *Mo. State Park Bd. v. McDaniel,* 473 S.W.2d 774, 779 (Mo.App.1971).

This remains true in the context of project influence. In the principal Missouri case discussing this doctrine, *State ex rel. State Highway Commission v. Wertz,* the Missouri Supreme Court noted a possibility in which a trial court may in its discretion admit evidence of comparable sales that have alleged project-influence, leaving it to the jury to determine the extent of influence, if any. *See* 478 S.W.2d 670, 675–77 (Mo.1972) (discussing trial court's discretion; stating in certain instances "evidence ought to be admitted, if the trial court determines that it would still be of substantial probative value on the issue of damages"); *see also, e.g., Spanbauer v. State, Dept. of Transp.,* 320 Wis.2d 242, 769 N.W.2d 137, 143 (Ct.App.2009) (no error to admit evidence when fact of project influence in dispute). The Missouri Supreme Court indicated that if a trial court decides to admit evidence that may contain project influence, the effect of the project influence should be explained and the opinion of value adjusted if possible to account for the influence. *See Wertz,* 478 S.W.2d at 677; *see also Baston v. County of Kenton ex rel. Kenton County Airport Bd.,* 319 S.W.3d 401, 409 (Ky.2010) (noting trial courts' freedom to employ ways to remove project influence); 4 NICHOLS § 12B.17(8)(c) (citing *U.S. v. 63.04 Acres of Land,* 245 F.2d 140, 144 (2d Cir.1957)). Additionally, the jury should be instructed that such influence should not be taken into account when awarding damages. *See* 4 Nichols § 12B.17(8)(c) (citing *U.S. v. 320.0 Acres of Land, More or Less in Monroe County, State of Fla.,* 605 F.2d 762, 800–01 (5th Cir.1979)).

 In determining whether to admit comparable sales evidence, the factors a trial court considers relating to relevance, or comparability, include the "time of transaction, size, shape and character of the comparable land, and whether there

has been any enhancement or depression in value." *Wertz,* 478 S.W.2d at 675. Thus, the date of the comparable sale is not a determinative factor on its own. Comparable sales that take place after the date of taking are generally irrelevant to the value of the land before the taking. *Jenkins,* 648 S.W.2d at 562. However, the precise date of the proffered comparable transaction makes no difference, "so long as it is not too remote a period of time and the land is reasonably comparable,...." *Wertz,* 478 S.W.2d at 675; *see also Jenkins,* 648 S.W.2d at 562. Thus, comparable sales should not be excluded for the sole reason that they occurred after the date of taking, but rather the trial court should exercise discretion, considering all factors to determine relevance. *Wertz,* 478 S.W.2d at 677.

However, the *Wertz* court went on to indicate a trial court's discretion does have a limit where the sales are clearly project-influenced. *Id.* at 675, 677. *See also,* 3 NICHOLS § 8A.01(9) (majority rule is exclusion of project-influenced sales). In the omitted portion of the *Wertz* court's statement above, the Missouri Supreme Court added that "reasonably comparable" sales are those "having been neither enhanced [n]or decreased in value by the project or improvement occasioning the taking." 478 S.W.2d at 675. Thus, if a trial court determines that proffered comparable sales prices were materially influenced. by the project, the court should exclude them. *See id.* at 677; *Quality Heights,* 799 S.W.2d at 870 (finding trial court abused discretion in failing to strike evidence clearly influenced by project). In a partial taking, as here, this applies to the determination of the value of the whole parcel of land immediately before taking, without the presence of the government project. *See generally Wertz,* 478 S.W.2d 670 (applying project influence doctrine to partial taking).

In the present case, Metcalf examined four sales of industrial property to arrive at his opinion of the value of the entire 1811 Property before the taking. Two of them were properties improved with terminal warehouses, buildings similar to the 1811 Building. Both of these sales were within a two-block radius of the 1811 Property. Each of the buildings was slightly smaller than the 1811 Building, and the lot sizes were smaller than the 1811 Property, so Metcalf adjusted the value upward for both the 1811 Building and the land. One of Metcalf's comparable buildings was built in the same year the 1811 Building was constructed. Both of these sales took place after the date of the taking in this case: one on February 22, 2010, and the other on May 11, 2011.

Metcalf also considered two sales of vacant land in determining the value of the 1811 Property. These sales were of industrial land further away from the 1811 Property, and agreed by the parties to be outside any influence of the bridge project. Metcalf concluded, after examining all four sales, that the highest price he could find for industrial land in the area was $4 per square foot.

When cross-examined concerning the extent of the influence of the bridge project on the two comparable sales of improved land, Metcalf testified that both buyers purchased these properties because of the bridge project. One of the buyers had told him this directly, and Metcalf assumed the other buyer purchased the land for that reason as well. Metcalf said this was because in his opinion, the bridge project actually enhanced industrial land values and drew buyers to the area. Additionally, Metcalf testified that the influence of the bridge project could not be separated from the sale prices of any land in the area because the bridge project had been

planned for many years before it came to fruition.

At this point, 1811 LLC's counsel asked that Metcalf's opinion be stricken from the record. The trial court allowed this evidence, but acknowledged that the issue of project influence regarding these sales was troubling both at trial and in its order denying the motion for new trial. The primary issue is whether the particular sales Metcalf used were tainted by project influence and so formed the basis of Metcalf's opinion of value that his entire opinion was inadmissible. *See Wertz,* 478 S.W.2d at 677.

▮ As an initial matter, it is clear that there was no requirement for the trial court here to disallow evidence of Metcalf's comparable improved land sales for the sole reason that the transactions took place after the date of the taking. *See id.* at 677 (reversing because trial court failed to exercise discretion in determining whether sales taking place after date of taking were nevertheless comparable and not materially influenced by project for which taken). The trial court did not err in concluding that the dates of the sales alone did not require the court to strike Metcalf's opinion.

▮ Metcalf's testimony regarding the number of years the bridge project was public knowledge before it actually began raises a difficulty in applying the project influence doctrine encountered in states that follow it. Namely, when a government project has been forecasted for a long period of time, it can become difficult to determine whether a change in property value during that time is due to the project or to other market forces. *See Merced Irrigation Dist. v. Woolstenhulme,* 4 Cal.3d 478, 500–01, 93 Cal.Rptr. 833, 483 P.2d 1 (1971) (noting landowner entitled to any enhanced value from factors besides project influence); 3 Nichols § 8A.01(7).

Especially where an appraiser is able to delineate the amount of the effect on value due to market forces and due to project influence, the court may admit the sales as evidence shedding light on value and the jury can adjust their award to account for the effect of project influence on those sales. *Woolstenhulme,* 4 Cal.3d at 501, 93 Cal.Rptr. 833, 483 P.2d 1.

▮ Here, considering the whole of Metcalf's testimony regarding the two improved sales, they were nevertheless inadmissible. Metcalf unequivocally stated that both of the sales of improved industrial land that he considered comparable sales took place because of the bridge project. He also stated that the bridge project had an effect on land prices in the area of the 1811 Property, which in his opinion was positive, despite the fact that his opinion of value was substantially lower than those of the landowner's witnesses. Furthermore, rather than explaining or adjusting for any effect of project influence, Metcalf made clear that he did not believe there was any way to do so. We have no indication that the jury was instructed to separate any project influence from the final determination of value. Thus, it is clear that there was no question as to the influence of the project on these particular sales, and this required exclusion as a matter of law. *See Quality Heights,* 799 S.W.2d at 870.

▮ The Commission responds that even without those two sales, the vacant land sales Metcalf considered provided sufficient evidence of value, because the taken land here was vacant land. However, Metcalf's own testimony contradicts this. He stated it would be improper for an appraiser to value improved property solely with sales of vacant land, which is consistent with Missouri law. *See Pearl's Estate v. Dir., Mo. State Div. of Welfare,* 538

S.W.2d 922, 926 (Mo.App.1976) (stating vacant lots dissimilar to improved lots under law; value of one cannot be derived from value of other). Therefore, because the calculation of fair market value of the rectangular portion requires calculating the value of the whole property and subtracting the remainder, if an appraiser concludes the HBU is to utilize the 1811 Building, he or she must use comparable sales of improved property in valuing the land taken.

In any event, even if Metcalf had utilized some proper non-project-influenced sales of industrial land, 1811 LLC argues that Metcalf's entire opinion of value before the taking was tainted because his project-influenced comparable sales formed the basis of his opinion of the 1811 Property's HBU. We agree.

 First, it is consistent with the project influence doctrine that the HBU determination of the property before the taking, as the threshold to the determination of land value, should not be influenced by the project necessitating the taking. *Accord U.S. v. 1.604 Acres of Land, More or Less, Situate in City of Norfolk, Va.,* 844 F.Supp.2d 668, 681 (E.D.Va.2011) (excluding appraiser's opinion because appraiser took into account influence of project in determining financial feasibility of current use). Because the HBU determination dictates whether a particular sale is comparable, the HBU may no more be based on project influence than proffered comparable sales may be.

 Here, Metcalf made clear that his opinion regarding the HBU of the 1811 Property before the taking was influenced by the project. The Commission's counsel asked Mr. Metcalf to describe his reasons "for determining the highest and best use as improved [industrial] as it sat there back in February of 2010." Metcalf responded:

Well, when you look at something that's improved, you look at, is it feasible to tear down that building to get to underlying money and it is not in this case. I have two terminal sales close by, within a two-block radius, that w[ere] purchased for continued use as terminal warehouse facilities. That is the best—highest and best use indicator that there possibly could be.... You don't ignore actual sales of similar terminals in the same neighborhood and project a hypothetical [commercial] use that is very speculative in nature. I wouldn't expect any of the public to come into an area like this, just because of security concerns.

Metcalf's opinion of HBU was based on project-influenced sales, as well as the neighborhood as he saw it in 2012. It is unclear whether he would have come to the same determination without such evidence. Thus, while it was certainly permissible for Metcalf as an appraiser to determine that the HBU of the 1811 Property in February of 2010 was industrial improved property, he was not permitted to do so based on the effect of the bridge project in the area.

 There may be situations in which an appellate court after the fact can distinguish permissible influences on an appraiser's opinion regarding HBU and uphold it where proper, but here we cannot. *Cf. Jenkins,* 648 S.W.2d at 562 (finding reasons other than project for HBU determination). In this particular context, the facts that these sales took place after the project and because of the project suggest that they succeeded as industrial property due to the project's influence on the nature of the area. As a result, Metcalf's reliance on these particular sales actually provides no probative support for

his opinion that the HBU was industrial before the project ever came to the area.

Finally, the Commission argues nevertheless that 1811 LLC was not prejudiced because the bridge project's influence was actually a positive one, and therefore no substantial or glaring injustice occurred. However, this assertion can only be true if the property's HBU was industrial before the taking.

To the contrary, there was evidence that preparations for construction of additional storage had begun on the rectangular parcel, which was fenced in with the Archview Property's newly-opened storage units. There was also evidence that 1811 LLC's plan to expand to the triangular portion had been approved by the ward's alderwoman. As such, commercial use of the property was reasonably set before the jury. *See Jenkins,* 648 S.W.2d at 560 (requiring consideration of uses reasonably expected in near future).

 Metcalf's project-influenced opinion in effect drove down the value of this land both by undermining the evidence of the commercial use in progress for the property, and then using that to find comparable sales evidence establishing a much lower industrial value. Thus, Metcalf's opinion in all likelihood had a depreciatory effect on the landowner's compensation. In light of these circumstances, we cannot say it is certain 1811 LLC suffered no prejudice as a result of this evidence. Metcalf was the Commission's only witness who gave testimony regarding the price of the land before the taking, thus his opinion of value influenced the jury's award. On the record before us, we find that the jury's consideration of project-influenced evidence caused substantial and glaring injustice to 1811 LLC.

There is no guarantee a future jury will agree with 1811 LLC's opinion of its property value if faced with competing opinions based on proper evidence, nor is there any guarantee that appraisers will conclude that all non-project-influenced evidence supports a commercial HBU of the 1811 Property. However, 1811 LLC is entitled to have a jury determine what the owners have lost by considering only proper evidence of value before the taking. Given the factual context, the trial court and the jury may encounter the difficulties in applying the project influence doctrine mentioned above, but the law requires they do so in order to ensure 1811 LLC is justly compensated for its actual loss. Point granted.

### Conclusion

Because Metcalf testified that the sales of improved property he relied on were project-influenced, those sales were inadmissible as a matter of law. Furthermore, because Metcalf's opinion regarding the HBU of the property before the taking was influenced by the bridge project, his entire opinion regarding the value of the 1811 Property before the taking was inadmissible. The trial court abused its discretion in failing to strike this portion of Metcalf's opinion. We reverse and remand for a new trial.

ROBERT M. CLAYTON III, J, and MAURA McSHANE, S.J., concur.